UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:05CV63 CDP |
| | ) | |
| B&D ELECTRIC, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

The United States brings this civil action under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 (CERCLA),

for recovery of costs incurred in responding to the release of hazardous substances

at the Missouri Electric Works Superfund Site, located in Cape Girardeau,

Missouri. I heard arguments on the parties' motions for summary judgment on

liability on April 13. I now conclude that the undisputed evidence shows that

defendants Interstate Power and Light and Florida Power & Light Company sold

"useful products" and were not arranging for the disposal or treatment of a

hazardous substance when they sold used transformers to a broker. They are not

liable as covered persons under CERCLA, 42 U.S.C. § 9607(a), and I will grant

their motion for summary judgment.[1]

---

[1] Defendants Flanders Electric Motor Service, Inc. and T & R Electric Supply Company, Inc. originally joined defendants' motion for summary judgment. However, on April 10, 2007, those defendants notified the Court of a pending settlement and mooted the motion on their

# I.    **Undisputed Facts**

From approximately 1954 to 1988, Missouri Electric Works, Inc. (MEW) operated a business that purchased, sold, and repaired electrical equipment in Cape Girardeau, Missouri.  A nationwide market existed at the time for used electrical transformers.  Both defendants sold electrical transformers to a third-party broker, National Electric Service (NES), who resold or transferred them to MEW.  NES was in the business of buying and selling used transformers at nationwide auctions, and sometimes selling or transferring the equipment to MEW, to make a profit.  MEW bought used transformers from companies throughout the country, including NES, to resell to private businesses, public institutions, and utilities in need of transformers, because it was profitable to do so.  Some transformers could be resold without any reconditioning or repair; others could not.   Both MEW and NES are no longer in operation and their owners are either deceased or incapacitated.[2]

Some of the oil in the transformers that were repaired, serviced, and resold by MEW contained polychlorinated biphenyls (PCBs), a hazardous substance

---

behalf.  Therefore "defendants" as used in this memorandum applies to the two defendants for which the motion is still pending, Interstate Power and Light and Florida Power & Light Company.

[2]  The parties dispute whether NES and MEW were engaged in a "joint venture."  The exact terminology to describe their relationship is irrelevant.  The undisputed facts concerning the sale and transfer of the transformers is sufficient to decide the issue here.

under CERCLA, 42 U.S.C. § 9601.  The Superfund Site consists of the MEW property and adjacent properties that were found to be contaminated with PCBs. During a Site visit in 1985, EPA contractors found leaking transformers stored outside, burn areas, oil spills, and areas of stressed vegetation.  Many transformers were thereafter removed by their former owners.  In 1989, EPA found that over seventy percent of the Site's surface soil was contaminated with PCBs, including over four acres of highly contaminated surface soil.  The groundwater was also contaminated by PCBs.

A large group of potentially responsible parties involved with the Site, which did not include defendants here, entered into a consent decree with the plaintiff and the state of Missouri in June 1992.  This group, which later became the MEW Trust, agreed to conduct a Remedial Design/Remedial Action on the PCB-contaminated soils at the Site and a Groundwater Design Investigation to characterize the rate and extent of contamination in the groundwater at the Site. The consent decree was lodged in 1992 and after extensive litigation the decree was held to be fair and reasonable, and was re-entered in 1996.  United States v. Union Elec. Co., 934 F. Supp. 324 (E.D. Mo. 1996).  The re-entry was affirmed by the Eighth Circuit in 1997.  132 F.3d 422 (8th Cir. 1997).

In 1999, MEW Trust sued other parties potentially responsible for hazardous substances at the Site, including the defendants here.  MEW Trust

sought contribution for costs it was obligated to pay the plaintiff under the consent decree. Defendants settled with MEW Trust in separate settlement agreements. Plaintiff then filed this suit in 2005 to recover from defendants additional costs associated with the Site.[3]

Defendant Interstate Power and Light (IPL) is a public utility company that supplies electricity to customers in Iowa, Illinois, Minnesota, and Wisconsin. During the time period at issue, IPL was upgrading its transformers with newer, more efficient models and selling the used transformers in the extensive resale market. Plaintiff has identified 11 transformers purchased at auction by NES from IPL between 1980 and 1982. The price NES paid for IPL's used transformers was as high as $4,137 per transformer. All of the transformers purchased by NES from IPL were free of leaks at the time of sale. The transformers had been taken out of service by IPL to upgrade the efficiency and capacity of transformers servicing its customers – not because they were at the end of their useful life. IPL sold the transformers to NES through its purchasing department and not through the IPL salvage department. NES then sold or sent the transformers to MEW. MEW resold for re-use at least 10 of the 11 transformers. Plaintiff admits that IPL's

---

[3] Defendants filed a third-party complaint against MEW Trust earlier in this case, alleging breach of the settlement agreements and seeking indemnification for any costs defendants were ultimately adjudged to owe the plaintiff related to the Site. MEW Trust's motion to dismiss the third-party complaint was granted on December 7, 2006. See doc. # 120.

primary motivation in selling the transformers to NES was not to dispose of hazardous substances.

Defendant Florida Power & Light Company (FPL) is among the largest and fastest-growing electric utilities in the United States, serving over 4 million customers in the state of Florida. FPL has periodically upgraded the efficiency and capacity of its customers' transformers and sold the used transformers in the nationwide market. Between 1976 and 1980, NES purchased 173 used transformers from FPL, which it subsequently resold or sent to MEW. NES paid as much as $1,125 for a single FPL transformer. At least 132 of the 173 transformers were resold for re-use by MEW to third parties.

## II. <u>Motions to Strike</u>

Defendants filed two motions to strike certain of plaintiff's exhibits. Specifically, defendants seek to strike portions of the declaration of Pauletta France-Isetts; the deposition testimony of Deborah Cotner, Willard King, Roy Rhodes, and Tom Giles; and portions of other business record exhibits submitted by plaintiff. Defendants argue that portions of the Isetts declaration are not based on personal knowledge but upon inadmissible hearsay and a review of unauthenticated documents. As for the deposition testimony, defendants argue that it is hearsay not within any hearsay exception. Defendants object to portions

of other exhibits on the grounds that they contain copies of unauthenticated documents and that no hearsay exception applies.

Many of the portions of the Isetts declaration to which defendants object relate to undisputed facts. The MEW Site has an extensive history of litigation and clean-up. Most of the statements in the Isetts declaration are simply background information. Others are supported by other admissible evidence in the record, including interrogatory answers, depositions, and the declarant's review of documents based on personal knowledge.

Plaintiff has stated that Cotner, Rhodes, and Giles are all available to testify at trial. Plaintiff has withdrawn the deposition testimony of King. Because these witnesses are available for cross-examination at trial, I find no prejudice to defendants in allowing the depositions as exhibits on summary judgment.

The portions of other exhibits which defendants seek to strike are mostly business records recovered by EPA from the MEW Site. I find that there is sufficient indicia of trustworthiness to accept these MEW records. There is testimony concerning their creation in the ordinary course of business and the correspondence on MEW stationary has indications of authenticity as well. Defendants' arguments about these documents go to the proper interpretation to be given to the documents, not to their admissibility.

Defendants also argue that plaintiff should be judicially estopped from relying on the MEW business records because of statements made by plaintiff in the earlier Union Electric litigation about the MEW Site. In that case, the court found that the same documents did not contain sufficient information to rely on them in an allocation of liability among the settling parties. 934 F. Supp. at 331. I agree with plaintiff that the statements made in the Union Electric litigation were questioning the completeness of MEW's business records for determining allocation, but were not implying that the records could not be used for any purpose. For this reason and those explained above, defendants' motions to strike will be denied.

## III. Summary Judgment Motions

### A. Legal Standard

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has met this burden,

the nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249.

**B. CERCLA Liability**

To establish a prima facie case of liability under CERCLA, the plaintiff must establish that: (1) the Site is a "facility;" (2) the defendants are "covered persons" under 42 U.S.C. § 9607(a); (3) there has been a "release" or "threatened release" of a "hazardous substance" at the Site; and (4) such release or threatened release caused the plaintiff to incur response costs. <u>United States v. Aceto Agr. Chems. Corp.</u>, 872 F.2d 1373, 1379 (8th Cir. 1989). The parties have stipulated that the only issue for the Court to decide is whether plaintiff can prove that defendants fall into one of the four categories of "covered persons" under § 107(a) of CERCLA.

Plaintiff claims that defendants qualify as what is commonly referred to as an 'arranger,' one of the CERCLA categories of covered persons, which is defined as:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or

incineration vessel owned or operated by another party or entity and containing such hazardous substances ...

42 U.S.C. § 9607(a)(3).

Because "arranged" is undefined in the statute, the Court must look to case law to define the boundaries of arranger liability. The Eighth Circuit has agreed with other courts that the legislative history of CERCLA provides little insight into how to interpret this word, but that a liberal judicial interpretation is consistent with CERCLA's remedial statutory scheme. Aceto, 872 F.2d at 1380. The Eighth Circuit applies a "totality of the circumstances" test for determining arranger liability. United States v. Hercules, 247 F.3d 706, 721 (8th Cir. 2001). The court of appeals has refused to establish any bright-line rules on arranger liability, but instead directs that the facts of each case be examined individually. Id. The court does not hesitate to look beyond a defendant's characterization of a transaction to determine whether in fact an arrangement for the disposal or treatment of a hazardous substance occurred. Aceto, 872 F.2d at 1381.

Some of the factors that courts within the Eighth Circuit have looked at in evaluating arranger liability under a totality of the circumstances approach include: control of the hazardous substance, ownership or possession of the substance, knowledge of the disposal site, specific intent to dispose, actual participation in activities casually connected to the arrangement for disposal, and a primary motivation to dispose. See Hercules, 247 F.3d at 720-21; Aceto, 872 F.2d

at 1381; <u>United States v. TIC Inv. Corp.</u>, 68 F.3d 1082, 1087-88 (8th Cir. 1995); <u>Yellow Freight System, Inc. v. ACF Industries, Inc.</u>, 909 F. Supp. 1290, 1298 (E.D. Mo. 1995). Courts in other circuits have looked at additional factors, including: the usefulness of the substance, the condition of the substance at the time of transfer, and consumer demand for the substance. <u>See</u> <u>In re Solutia, Inc.</u>, 10 EAD 193, 214 (EAB 2001); <u>Pneumo Abex Corp. v. High Point, Thomasville and Denton R.R Co.</u>, 142 F.3d 769, 775 (4th Cir. 1998); <u>United States v. Wedzeb</u>, 844 F. Supp. 1328, 1336 (S.D. Ind. 1994).

Defendants argue that they do not qualify as 'arrangers' under CERCLA because the used transformers that they sold to NES, which NES later sold or transferred to MEW, were useful products and that the sale of them represented mere participation in the nationwide resale market without any intent to dispose.

In 1989, the Eighth Circuit acknowledged the useful product defense when it recognized that courts have "refused to impose liability where a 'useful' substance is sold to another party, who then incorporates it into a product, which is later disposed of." <u>Aceto</u>, 872 F.2d at 1381. However, the court found that the defense did not apply in that case because of factual distinctions between <u>Aceto</u> and a leading case at the time, <u>Florida Power & Light Co. v. Allis Chalmers Corp.</u>,

27 Env't Rep. Cas. (BNA) 1558 (S.D. Fla. 1988).[4] In Aceto, the defendants were pesticide manufacturers who were hired to formulate technical grade pesticides into commercial grade pesticides. In the Aceto transactions, ownership of the hazardous substance never transferred, so the formulation process – in which waste was inherently generated – was performed on a product owned by the defendants, for the defendants' benefit, and at their supervision. In Allis Chalmers, in contrast, the defendant sold electrical transformers containing PCB-contaminated oil to a buyer who used them for 40 years before making the decision to dispose of them at the site in question. See Aceto, 872 F.2d at 1381(citing Allis Chalmers, 27 Env't Rep. Cas. at 1558-60). The Eighth Circuit found the useful product defense inapplicable in Aceto because of the lack of transfer of ownership, the differences in the activity or process, and the defendant's removal or distance from the disposal. Id.

Unlike Allis Chalmers, which involved the sale of new transformers, the defendants here were selling used transformers. There is no Eighth Circuit authority on this precise factual scenario, but many other courts have found that the sale of used but operable, intact, and non-leaking transformers does not constitute an arrangement for disposal or treatment under CERCLA. United States

---

[4] After the Eighth Circuit's decision in Aceto, the Eleventh circuit affirmed the district court's holding in Allis Chalmers. 893 F.2d 1313 (11th Cir. 1990).

v. North Landing Line Constr., 3 F. Supp. 2d 694 (E.D. Va. 1998); United States v. Gordon Stafford, 810 F. Supp. 182 (N.D.W. Va. 1993); C. Greene Equip. Corp. v. Electron Corp., 697 F. Supp. 983 (N.D. Ill. 1988). One court has held that such sellers were liable as arrangers under CERCLA when they sold the equipment through a public auction to a scrap dealer. United States v. Summit Equip. & Supplies, Inc., 805 F. Supp. 1422 (N.D. Ohio 1992). That court inferred an arrangement for disposal based on who the buyer of the used equipment was. Id. at 1432. The court distinguished its holding from situations like C. Greene where the buyer was a broker in used equipment. Id.

In a 2001 case before the Environmental Appeals Board on the issue of CERCLA arranger liability and the applicability of the useful product defense, the Board held that the petitioner was not liable, stating that the EPA had offered no evidence to rebut the petitioner's evidence that the materials were a useful product at the time of the sale. In re Solutia, Inc., 10 EAD 193 (EAB 2001). The Board found that the factually significant question was the condition of the product at the time of sale and that the affidavits submitted by the petitioner were sufficient to satisfy its initial burden. Petitioner's showing shifted the burden to the EPA who failed to rebut the evidence. Id. at 214. With this case history as background, I turn to the facts of this case.

### C.    Discussion

#### 1.    Interstate Power and Light (IPL)

IPL sold 11 used transformers to NES, a broker in used electrical
equipment, who then resold or transferred the transformers to MEW.  Dale Sharp,
former president of Interstate Power Company, a predecessor to IPL, stated in an
affidavit that the transformers sold to NES were intact and working at the time of
the sale.  In a deposition he further explained that all the transformers were in
useable condition when the company's purchasing department requested bids from
used equipment dealers to purchase the transformers.  Dealers were contacted
because the intention of the sale was that the transformers would be resold.  Sharp
explained that failed transformers were sold for salvage and marked 'as is' on the
sales invoices.  That designation was not written on any of the paperwork
concerning the 11 transformers sold to NES.

MEW did in fact resell 10 of the 11 transformers; the records are incomplete
as to what happened with the remaining transformer.  Plaintiff admits that an
extensive resale market existed for used electrical equipment at the time of the
sale, and that IPL's primary motivation was to sell the transformers for resale.

I find no dispute of material facts, and conclude that IPL did not arrange for
the disposal or treatment of PCBs in the sale of used, intact, and non-leaking
transformers to a broker in the business of buying and selling used electrical

equipment. Plaintiff has no evidence disputing Sharp's testimony that the transformers were working and intact at the time of sale. Additionally, the facts of this case are more compelling than the facts of other cases where courts have found no arranger liability.

Plaintiff argues that because MEW repaired the 10 transformers before reselling them, the Court can infer that the transformers were not operable and working at the time IPL sold them. The undisputed evidence shows that MEW did not perform any repairs or reconditioning of transformers until it had a buyer for the particular transformer. As a result, some transformers were not examined until months or years after arriving at MEW. Plaintiff's evidence of repairs done by MEW at some point in time does not prove the condition of the transformers at the time of the sale. Additionally, even though repairs were done, there is no evidence that the repairs were necessary for the operation of the transformer. Some repairs were nothing more than a fresh coat of paint. Although others involved more extensive repair work, there is no evidence indicating that the disposal of potentially contaminated oil was inherent in every repair done. MEW's incomplete business records on the purchase, repair, and sale of its transformers are not evidence of the condition of the equipment at the time IPL sold the equipment to NES.

The material facts are not disputed, and the reasonable inferences from those facts are all in defendant's favor. An extensive market existed for used transformers at the time of the sale. Consumer demand demonstrates the usefulness and value of the transformers. See Wedzeb, 844 F. Supp. at 1332, 1335-36. The buyer, NES, was a broker who dealt in used electrical equipment. Plaintiff admits that NES purchased equipment with the intention of reselling it. See North Landing, 3 F. Supp. 2d 694 (finding no arranger liability where defendant contracted with third-party to remove used transformers and third-party informed defendant that it would resell them, but they were actually illegally disposed of at scrap yard); cf. Summit, 805 F. Supp. 1422 (inferring an arrangement for disposal when defendant sold used, working equipment to a scrap dealer instead of a broker). There is also no dispute that IPL's primary motivation in selling the transformers was that they would be resold. See Yellow Freight, 909 F. Supp. 1290 (holding that sale does not constitute an arrangement for disposal unless the seller is primarily motivated to dispose of the hazardous substance through the sale). Similar to Allis Chalmers, the case used by the Eighth Circuit to distinguish the facts of Aceto and deny the applicability of the useful product defense, the activity undertaken by IPL here was not sending equipment out for repair or reformulation but was a sale, the defendants retained no ownership

interest in the transformers, and the defendants were removed in time and space from the actual disposal of the transformers.

In addition, some of the facts of this case are more compelling for finding no arranger liability than the facts of other used equipment sales cases with the same result. For example, in <u>North Landing</u> a lot of used transformers was sold for only one dollar, and in <u>Wedzeb</u> more equipment than the purchased amount was included at no extra cost. 3 F. Supp. 2d at 698; 844 F. Supp. at 1332. Here, NES paid IPL anywhere from $333 to $4,137 per transformer. The Environmental Appeals Board found no liability in <u>In re Solutia</u> where only 20% of the product was resold for use. 10 EAD at 215. MEW resold approximately 91% of the transformers purchased from IPL.

Based on the totality of the circumstances and in light of the established case law, the undisputed facts show that IPL is not liable as a CERCLA covered person for its sale of used transformers which ended up at the MEW Site, and it is entitled to judgment as a matter of law.

2.    *Florida Power & Light Company (FPL)*

FPL sold 173 used transformers to NES, which NES then resold or transferred to MEW. FPL actually sold more than 173 transformers to NES, but NES immediately resold the additional transformers to other customers and they never went to the contaminated MEW Site. At least 132 of the 173 transformers

which went to MEW were resold by MEW for re-use.  In 1986, after being

contacted by EPA, FPL removed the remaining 45 transformers from the MEW

Site, and disposed of them.

I find no dispute of material facts and I conclude that FPL did not arrange

for the disposal or treatment of PCBs in the sale of used transformers to NES.

Plaintiff simply has no evidence of the condition of the transformers at the time of

sale, and there are no reasonable inferences that can be drawn to support plaintiff's

position.  The evidence plaintiff relies on to argue that the transformers must not

have been useful products  requires speculation and unreasonable inferences, so

summary judgment is proper.

Plaintiff argues that MEW records showing repairs of some transformers

raises an inference that the transformers were damaged or in need of repair at the

time FPL sold them to NES.  Although the MEW records do indicate that a small

number of the transformers from FPL leaked or were missing parts, the records

reflect the condition of the transformers over the period of time – in some cases

several years – at which they were stored outside at MEW.  Those records, just

like the similar records relating to IPL, do not show the condition of the

transformers when they left FPL.  As with the IPL transformers, MEW only

recorded repairs when it was repairing a transformer for resale, so there is no way

to know if the repairs were necessary when the transformer arrived at MEW or

only later became necessary because of MEW's storage or handling practices. And, of course, even had the records shown the condition of the transformer at the time it arrived at MEW, that still would not establish the condition of the transformer at the time FPL sold it. Plaintiff admits that an extensive resale market existed, that NES resold some of the FPL units immediately before shipping to MEW, and that those sales occurred before any repairs were performed. This evidence is consistent with FPL's testimony that it only sold NES transformers that were intact and working at the time of the sale.

Plaintiff also relies on two business records: one from FPL referring to one lot of transformers "junk" and the other from NES describing a lot as "scrap." An affidavit from FPL's associate general counsel, who is familiar with the common practices of FPL and has knowledge of the FPL and NES transactions, states that working and re-usable equipment was often referred to as "scrap" or "junk" within the company. These designations meant that the equipment was no longer useful to FPL – not that it was no longer in useable condition. Additionally, FPL has presented uncontradicted evidence that it had different practices for selling working transformers and for selling non-working transformers: it sold transformers for re-use to NES and based the prices on the kilovolt amperage of the units, while it sold transformers not intended for re-use to a metal recycling facility and based the prices on weight.

Plaintiff also relies on a handwritten letter from Dick Giles, former owner and operator of MEW, to Ray Guehne, owner of NES. In the letter Giles notified Guehne that a shipment of transformers from FPL arrived at MEW with nine broken or missing bushings that would require replacement. At the end of the letter Giles indicated that he hoped the "insurance" would cover the expense of replacing the bushings. Plaintiff argues that this letter shows that the transformers were damaged when FPL sold them to NES, but under the circumstances here, that is speculation, and is not a reasonable inference. All FPL transformer sales to NES were FOB. NES was responsible for removing and transporting the transformers off the FPL site. Because Giles and Guehne are now deceased or incapacitated, there is no evidence as to what "insurance" this letter is referring to. FPL suggests that Giles or Guehne had shipping insurance and therefore this letter indicates that the transformers were damaged in transit, after leaving FPL. Plaintiff offers no evidence as to what insurance Giles was referring, but no matter the issue of insurance, I agree with FPL that this letter sheds no light on the condition of the transformers at the time of sale.

Plaintiff has no evidence of the condition of the transformers at the time of sale from which a fact-finder could reasonably infer that the transformers were not a useful product. Like the court in C. Greene, I find the evidence in this case insufficient to support an inference that the transformers were leaking or not intact

at the time of the sale. 697 F. Supp. at 987. FPL has not arranged for disposal of a hazardous substance within the meaning of CERCLA by selling used transformers to a broker of used electrical equipment, because the evidence shows that the transformers were useful products at the time FPL sold them. See Gordon Stafford, 810 F. Supp. at 185.

Comparisons with other cases support this conclusion. Consumer demand demonstrates the usefulness and value of the transformers. See Wedzeb, 844 F. Supp. at 1332, 1335-36. Plaintiff admits that the broker-buyer, NES, purchased equipment with the intention of reselling it. See North Landing, 3 F. Supp. 2d 694; Summit, 805 F. Supp. 1422. As with IPL, FPL's facts are more compelling than those in other equipment cases finding no arranger liability. Unlike North Landing where the lot of used transformers was sold for only one dollar, and Wedzeb where extra equipment was included at no cost, NES paid as much as $1,125 for a single FPL transformer. 3 F. Supp. 2d at 698; 844 F. Supp. at 1332. At least 76% of the FPL transformers were resold by MEW for re-use, whereas only 20% of the product was resold in In re Solutia, where the Environmental Appeals Board found no arranger liability. 10 EAD at 215.

## V.    Conclusion

Defendants' motions to strike will be denied because the exhibits at issue either pertain to undisputed background facts, are adequately supported by other

admissible evidence in the record, are made by deponents who are available to testify at trial, or contain sufficient indicia of trustworthiness to be allowed.

Defendants' motion for summary judgment will be granted as to defendants Interstate Power and Light and Florida Power & Light Company, because the undisputed evidence shows that their sales of used transformers does not constitute an arrangement for disposal or treatment of a hazardous substance under CERCLA, and therefore neither is liable for any response costs incurred by the plaintiff at the MEW Site. Plaintiff has provided no evidence that the transformers were not a "useful product" at the time of sale. Because there are no material facts in dispute, summary judgment will be granted and this case will be dismissed as to these defendants.

Plaintiff also filed motions for partial summary judgment on the counterclaim and on certain elements of liability. These motions are uncontested by defendants, and so I will grant them. I will deny the other pending motions as moot.

The Clerk of Court recently entered default as to defendant Mount Vernon Electric Motor Service, Inc. Plaintiff's motion for entry of default indicated that it would seek default judgment after the Court ruled on its motion for summary judgment on costs. Because I am granting summary judgment to the remaining non-settling defendants, I need not rule the motion for summary judgment

regarding costs, and I will deny it as moot. The legal standards for summary judgment are not the same as those for default, especially in a case of this nature. Plaintiff thus needs to file a separate motion for default judgment with regard to the defaulting defendant. For administrative ease, plaintiff may incorporate by reference any exhibits from the earlier motion rather than refiling them, but I need a new motion and memorandum in support setting out the proper legal and factual issues for entry of default judgment.

Although it appears that some form of resolution has now been reached as to all defendants, I am not issuing a judgment even as to Interstate Power and Light and Florida Power & Light Company because no judgment would be final until the case is resolved as to all defendants. If the parties think final judgment can be entered on some part of the case sooner, they should file a motion to that effect, citing appropriate authority.

Accordingly,

**IT IS HEREBY ORDERED** that the United States' motion for partial summary judgment on counterclaim [#129] is GRANTED.

**IT IS FURTHER ORDERED** that the United States' motion for partial summary judgment on certain elements of liability of certain defendants [#145] is GRANTED. The parties agree that the only issue on liability for the Court to

decide is whether plaintiff can prove that defendants are "covered persons" under § 107(a) of CERCLA.

**IT IS FURTHER ORDERED** that defendants' motions to strike [#153 & 169] are DENIED.

**IT IS FURTHER ORDERED** that defendants' joint motion for summary judgment [#132] is GRANTED as to defendants Interstate Power and Light and Florida Power & Light Company.

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment on defendant Florida Power & Light's liability [#144] is DENIED.

**IT IS FURTHER ORDERED** that all other pending motions [#134, 136, 140, & 162 ] are DENIED as moot.

**IT IS FINALLY ORDERED** that plaintiff shall file a motion for default judgment as to defendant Mount Vernon Electric Motor Service, Inc. no later than **June 8, 2007**.  Plaintiff may incorporate by reference the exhibits previously filed with the cost summary judgment motion, but if it does so it should specifically refer to them in its motion and memorandum by the Court's docket numbers as well as by their exhibit numbers.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of May, 2007.